Case No. 18-14096-HH, *Keohane v. Florida Department of Corrections Secretary*

# UNITED STATES COURT OF APPEALS
# FOR THE ELEVENTH CIRCUIT

Case No. 18-14096-HH

REIYN KEOHANE,

*Plaintiff-Appellee*,

v.

FLORIDA DEPARTMENT OF CORRECTIONS SECRETARY,

*Defendant-Appellant*.

Appeal from the United States District Court for the Northern District of Florida

## BRIEF OF PLAINTIFF-APPELLEE REIYN KEOHANE

**Daniel B. Tilley**
Florida Bar No. 102882
ACLU Foundation of Florida
4343 W. Flagler St., Suite 400
Miami, FL 33134
T. (786) 363-2714
F. (786) 363-1257
DTilley@aclufl.org

**Leslie Cooper**
ACLU Foundation
125 Broad Street, 18th Floor
New York, NY 10004
T. (212) 549-2627
LCooper@aclu.org

**Elizabeth C. Akins**
DLA Piper LLP (US)
1201 W. Peachtree Street, NW
Suite 2800
Atlanta, GA 30309
T. (404) 736-7812
liza.akins@dlapiper.com

Case No. 18-14096-HH, *Keohane v. Florida Department of Corrections Secretary*

## CERTIFICATE OF INTERESTED PERSONS AND
## CORPORATE DISCLOSURE STATEMENT

Pursuant to Eleventh Circuit Rule 26.1-2(b), Plaintiff-Appellee states that the CIP contained in Defendant-Appellant's brief is complete.

Pursuant to Federal Rule of Appellate Procedure 26.1 and Eleventh Circuit Rules 26.1-1 through 26.1-3, Plaintiff-Appellee states that there are no corporate disclosures.

Case No. 18-14096-HH, *Keohane v. Florida Department of Corrections Secretary*

## STATEMENT REGARDING ORAL ARGUMENT

Plaintiff-Appellee Reiyn Keohane agrees with Defendant-Appellant Julie Jones (in her official capacity as Secretary of the Florida Department of Corrections) that oral argument should be heard in this case. Important constitutional issues are implicated in the provision of medical care by prison officials who deny medically necessary care based on blanket policies barring certain care or who lack the competence to assess medical need.

Case No. 18-14096-HH, *Keohane v. Florida Department of Corrections Secretary*

# TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PERSONS AND CORPORATE DISCLOSURE STATEMENT ................................................................1

Statement Regarding Oral Argument .......................................................3

Table of Contents ...................................................................................4

Table of Authorities ..............................................................................6

Statement of Issues ................................................................................9

Statement of the Case ............................................................................9

A.    Nature of the Case ........................................................................9

B.    Course of Proceedings and District Court Disposition ...............10

C.    Statement of Facts........................................................................11

D.    Standard of Review.......................................................................30

Summary of Argument ..........................................................................31

Argument...............................................................................................32

I.    The District Court correctly held that the DOC has been and is deliberately indifferent to Ms. Keohane's serious medical need for treatment for gender dysphoria. ...............................................................32

A.    Ms. Keohane has a serious medical need for hormone therapy and for access to the DOC's female clothing and grooming standards. ...................32

B.    The Court did not err in concluding that denying Ms. Keohane the ability to socially transition by prohibiting her from following the DOC's female clothing and grooming standards constitutes deliberate indifference. ...................................................................................38

C.    The DOC's pretrial stipulation concerning security issues takes that justification for the denial of treatment off the table. ....................50

II.    The District Court correctly held that the DOC failed to meet its burden under the voluntary-cessation standard................................................51

A.    The DOC misstates the basis of the District Court's decision. ....................52

B.    On these facts, the DOC's policy change does not entitle it to the rebuttable presumption typically afforded to government actors................52

Case No. 18-14096-HH, *Keohane v. Florida Department of Corrections Secretary*

III.   The District Court's Order satisfies the requirements of the Prison Litigation Reform Act. ........................................................................53

A.   The Order includes the need, narrowness, and intrusiveness findings required by the PLRA. .......................................................................54

B.   The final order gives appropriate "weight to any adverse impact on public safety," because the DOC explicitly waived reliance on a security defense. ...............................................................................57

Conclusion ....................................................................................................58

CERTIFICATE OF COMPLIANCE ..............................................................59

CERTIFICATE OF SERVICE ........................................................................59

Case No. 18-14096-HH, *Keohane v. Florida Department of Corrections Secretary*

## TABLE OF AUTHORITIES

**Cases**

*Allard v. Gomez*, 9 F. App'x 793 (9th Cir. 2001) .....................................................40

*Ancata v. Prison Health Servs., Inc.*, 769 F.2d 700 (11th Cir. 1985)............... 39, 43

*Armstrong v. Schwarzenegger*, 622 F.3d 1058 (9th Cir. 2010)...............................55

*Arnold v. Wilson*, No. 1:13-cv-900, 2014 WL 7345755 (E.D. Va. Dec. 23, 2014) .......................................................................................................................35

*Baez v. Rogers*, 522 F. App'x 819 (11th Cir. 2013) ......................................... 38, 39

*Barrett v. Coplan*, 292 F. Supp. 2d 281 (D.N.H. 2003) ..........................................41

*Benjamin v. Fraser*, 343 F.3d 35 (2d Cir. 2003) .....................................................55

*Blake v. Pryse*, 444 F.2d 218 (8th Cir. 1971) .........................................................35

*Brooks v. Berg*, 270 F. Supp. 2d 302 (N.D.N.Y. 2003)............................................41

*Brown v. Johnson*, 387 F.3d 1344 (11th Cir. 2004) ................................................38

*Brown v. Plata*, 563 U.S. 493 (2011)............................................................... 32, 58

*Casey v. Hall*, No. 2:11-cv-588-FTM-29SPC, 2011 WL 5583941 (M.D. Fla. Nov. 16, 2011)........................................................................................................35

*Colwell v. Bannister*, 763 F.3d 1060 (9th Cir. 2014) .............................................39

*\*De'lonta v. Angelone* (*De'lonta I*), 330 F.3d 630 (4th Cir. 2003).........................40

*\*De'lonta v. Johnson* (*De'lonta II*), 708 F.3d 520 (4th Cir. 2013) .................. 46, 48

*DeBlasio v. Johnson*, 128 F. Supp. 2d 315 (E.D. Va. 2000) ...................................36

*\*Doe v. Wooten*, 747 F.3d 1317 (11th Cir. 2014)............................................. 51, 52

*Dunn v. Dunn*, 219 F. Supp. 3d 1100 (M.D. Ala. 2016) .........................................48

*Estelle v. Gamble*, 429 U.S. 97 (1976) ...................................................................32

*Farrow v. West*, 320 F.3d 1235 (11th Cir. 2003)....................................................33

Case No. 18-14096-HH, *Keohane v. Florida Department of Corrections Secretary*

*\*Fields v. Smith*, 653 F.3d 550 (7th Cir. 2011) ................................................ 40, 54

*Fields v. Smith*, 712 F. Supp. 2d 830 (E.D. Wis. 2010) ................................... 33, 46

*Gates v. Cook*, 376 F.3d 323 (5th Cir. 2004) ........................................................ 55

*Glenn v. Brumby*, 724 F. Supp. 2d 1284 (N.D. Ga. 2010) ...................................... 46

*Harris v. Thigpen*, 941 F.2d 1495 (11th Cir. 1991) ................................................ 43

*Hicklin v. Precynthe*, No. 4:16-cv-1357, 2018 WL 806764 (E.D. Mo. Feb. 9, 2018) ...................................................................................................................... 34

*Hood v. Dep't of Children & Families*, No. 2:12-cv-637-FTM-29, 2014 WL 757914 (M.D. Fla. Feb. 26, 2014) ........................................................................ 36

*Houston v. Trella*, No. 2:04-cv-1393, 2006 WL 2772748 (D.N.J. Sept. 22, 2006) ............................................................................................................................ 41

*Johnson v. Breeden*, 280 F.3d 1308 (11th Cir. 2002) ............................................ 54

*Johnson v. Wright*, 412 F.3d 398 (2d Cir. 2005) ................................................... 39

*Jones v. Warden of Stateville Corr. Ctr.*, 918 F. Supp. 1142 (N.D. Ill. 1995) ........ 35

*Jorden v. Farrier*, 788 F.2d 1347 (8th Cir. 1986) ................................................. 40

*Konitzer v. Frank*, 711 F. Supp. 2d 874 (E.D. Wis. 2010) ..................................... 33

*LaBranch v. Terhune*, 192 F. App'x 653 (9th Cir. 2006) ....................................... 35

*Larkin v. Reynolds*, 39 F.3d 1192, 1994 WL 624355 (10th Cir. 1994) (Table) ...... 35

*Long v. Nix*, 877 F. Supp. 1358 (S.D. Iowa 1995) ................................................. 36

*Lynch v. Lewis*, No. 7:14-cv-24, 2015 WL 1296235 (M.D. Ga. Mar. 23, 2015) .... 46

*Mahan v. Plymouth Cty. House of Corr.*, 64 F.3d 14 (1st Cir. 1995) .................... 40

*McElligott v. Foley*, 182 F.3d 1248 (11th Cir. 1999) ............................................ 38

*Monmouth Cty. Corr. Institutional Inmates v. Lanzaro*, 834 F.2d 326 (3d Cir. 1987) ...................................................................................................................... 40

*Moore v. Duffy*, 255 F.3d 543 (8th Cir. 2001) ...................................................... 43

Case No. 18-14096-HH, *Keohane v. Florida Department of Corrections Secretary*

*Murray v. U.S. Bureau of Prisons*, 106 F.3d 401, 1997 WL 34677 (6th Cir. 1997) (Table) ...................................................................................................36

*Praylor v. Texas Dep't of Criminal Justice*, 430 F.3d 1208 (5th Cir. 2005),..........36

*Smith v. Hayman*, No. 09-cv-2602, 2010 WL 9488822 (D.N.J. Feb. 19, 2010) .....36

*\*Soneeya v. Spencer*, 851 F. Supp. 2d 228 (D. Mass. 2012)................ 33, 34, 41, 46

*Star v. Gramley*, 815 F. Supp. 276 (C.D. Ill. 1993)...................................................35

*Stitzel v. New York Life Ins. Co.*, 361 F. App'x 20 (11th Cir. 2009)......................37

*Taylor v. Gandy*, No. 11-cv-27, 2012 WL 6062058 (S.D. Ala. Nov. 15, 2012) .....35

*Thomas v. Bryant*, 614 F.3d 1288 (11th Cir. 2010) .......................................... 31, 54

*Troiano v. Supervisor of Elections in Palm Beach Cty., Fla.*, 382 F.3d 1276 (11th Cir. 2004)...............................................................................................31

*United States v. DeCologero*, 821 F.2d 39 (1st Cir. 1987).....................................43

*Waldrop v. Evans*, 871 F.2d 1030 (11th Cir. 1989).................................................43

**Statutes**

18 U.S.C. § 3626................................................................................... 54, 57

**Regulations**

Fla. Admin. Code r. 33-602.101 ...................................................... 26, 27

Case No. 18-14096-HH, *Keohane v. Florida Department of Corrections Secretary*

## STATEMENT OF ISSUES

1.     Whether the district court erred in concluding that the Defendant-Appellant Jones's ("DOC") treatment of Plaintiff-Appellee Keohane's gender dysphoria violates the Eighth Amendment's prohibition on cruel and unusual punishment.

2.     Whether the district court erred in finding that the DOC failed to satisfy its burden under the voluntary-cessation doctrine.

3.     Whether the district court failed to give effect to some requirements of the Prison Litigation Reform Act.

## STATEMENT OF THE CASE

### A. Nature of the Case

Plaintiff-Appellee Reiyn Keohane is an inmate in the custody of the Florida Department of Corrections ("DOC"). *See* Trial Order ("Order") at 2. Ms. Keohane is transgender and has been diagnosed with gender dysphoria, a psychiatric diagnosis that refers to distress that is caused by a discrepancy between a person's gender identity and their sex assigned at birth. Order at 2, 5.  She has suffered severe harm due to the DOC's refusal to provide medically necessary care for this serious medical condition. *See infra* at 20-29. She contends that the District Court, after a two-day trial, correctly concluded that the DOC violated her constitutional rights by denying

Case No. 18-14096-HH, *Keohane v. Florida Department of Corrections Secretary*

her access to hormone therapy for two years and continuing to deny her access to the DOC's female clothing and grooming standards.

Ms. Keohane did not appeal the District Court's decision denying her claim for nominal damages.

### B. Course of Proceedings and District Court Disposition

Ms. Keohane began filing grievances in August 2014, shortly after entering DOC custody on July 17, 2014. Keohane Decl. (ECF 3-1) ¶¶ 9-11. On August 15, 2016, she filed her complaint and motion for preliminary injunction. ECF 1, 3. Originally, the complaint included not only Defendant-Appellant Jones but also Defendants Acosta, Dieguez, and Le. ECF 1.  These other Defendants were ultimately dismissed as unnecessary to secure the relief requested. *See* ECF 50, 92-93.

On September 12, 2016, the defendants filed motions to dismiss. ECF 20-22. The district court denied (in relevant part) the defendants' motions to dismiss and Ms. Keohane's motion for preliminary injunction. ECF 50-51.

The DOC filed a motion for summary judgment on June 12, 2017, ECF 124-125, which was denied without hearing, ECF 138. A trial was held on July 19-20, 2017. ECF 140, 145-146. The final order and judgment were entered in Ms. Keohane's favor on August 22, 2018. ECF 171, 172. The DOC timely appealed on September 21, 2018. ECF 179.

Case No. 18-14096-HH, *Keohane v. Florida Department of Corrections Secretary*

## C. Statement of Facts

There is no dispute that Ms. Keohane is a transgender woman—that is, her birth-assigned sex was male, but she identifies as female. Order at 4. And there is no dispute that she has gender dysphoria. *Id.* at 6.

> As the District Court found, Ms. Keohane
>
> began identifying as female around age eight. She says she's always had an "internal sense" of being female. Since age fourteen, Ms. Keohane has worn women's clothing, makeup, and hair styles, adopted a feminine name, and used female pronouns at school and with family and friends. In short, she's lived as a woman in all aspects of her life since her early teens.
>
> Ms. Keohane was formally diagnosed with gender dysphoria at age sixteen, and as soon as she was permitted—and it was safe to do so—she began a hormone therapy regimen to ease her dysphoria and feminize her body. But shortly thereafter, she was arrested and cut off from the treatment she needed, including hormone therapy and the ability to dress and groom as a woman.

*Id.* at 1-2 (footnote omitted). Specifically, on September 22, 2013, Ms. Keohane was charged with attempted second-degree murder and was taken into the custody of the Lee County Jail. *Id.* at 10. The Lee County Jail refused to continue her hormone therapy. *Id.* In July 2014, she accepted a plea deal of 15 years. *Id.* On July 17, 2014, she began her commitment with the DOC at the South Florida Reception Center ("SFRC"). *Id.*

*The DOC's Failure to Treat Ms. Keohane's Gender Dysphoria*

Case No. 18-14096-HH, *Keohane v. Florida Department of Corrections Secretary*

Ms. Keohane has been requesting treatment for her gender dysphoria since shortly after her arrival at the SFRC. *See id.* at 11. "Over the next three years," she "persistently requested treatment for her gender dysphoria, including hormone therapy, access to female undergarments including bra and panties, and access to female grooming standards including longer hair and makeup." *Id.* at 10 (citing grievances).[1] She had numerous conversations with mental-health and medical officials at the DOC regarding these same needs.[2]

Regarding hormones, the response in September 2014 (soon after Ms. Keohane's entry into DOC custody) was categorical: "you will not be placed on hormonal therapy while incarcerated in the Florida State Dept. of Corrections. If you are having mental health concerns, please write a request to our Mental Health Dept. for an appointment to be seen."[3] Ms. Keohane's requests pertaining to social transition fared no better.[4]

---

[1] As of the time of trial, Ms. Keohane had lost approximately 84 days of gain time related to her asserting her rights. Trial Day 1 ("T1") at 58:21-25.

[2] ECF 3-1 ¶ 10.

[3] Selected Pre-Litigation Grievances (ECF 3-6) at 3 (transcribed at ECF 3-1 ¶ 15).

[4] *See, e.g.*, Selected Pre-Litigation Grievances (ECF 3-6) at 9 (transcribed at ECF 3-1 ¶ 23) (requesting "an appointment to discuss the psychological necessity of myself dressing as a female, and the availability of a pass for this way of dressing"); ECF 3-6 at 11 (transcribed at ECF 3-1 ¶ 29) (requesting treatment for gender dysphoria, including the ability to live and dress as the gender with which she identifies); ECF 3-6 at 12 (transcribed at ECF 3-1 ¶ 30) (grieving confiscation of sports bras and female underpants); ECF 3-6 at 12 (transcribed at ECF 3-1 9 ¶ 31) (denying grievance regarding confiscation of female undergarments, stating "At a male

Case No. 18-14096-HH, *Keohane v. Florida Department of Corrections Secretary*

Shortly after her arrival at Everglades CI in February 2016, where she spent more time than any other facility,[5] she met with the medical director of Everglades CI, Teresita Dieguez. [6] In one meeting, Dr. Dieguez refused to discuss Ms. Keohane's transgender status, instead saying, "you are only here so I can determine the state of your genitals."[7] Before the meetings with Dr. Dieguez, Ms. Keohane had been housed alone.[8] After the meetings, she was assigned a roommate.[9] The housing

---

institution only T-Shirts, Boxers, Pants, and Blue Shirts are authorized. Any other clothing is unauthorized."); ECF 3-6 at 14 (transcribed at ECF 3-1 ¶ 38) (describing symptoms of her gender dysphoria and her need for treatment, including hormone therapy and ability to live as female); ECF 3-6 at 16 (transcribed at ECF 3-1 ¶ 41) (same); Selected Post-Litigation Grievances (ECF 129-23) at 6 ("I require access to all clothing and canteen items restricted to female inmates, as it is a medical necessity that I be able to socially transition and live as a female inmate. ... Being unable to wear gender-conforming clothing, especially underwear, causes me severe physical discomfort that at times makes me ill, unable to eat, and is the source of depression, anxiety, feelings of hopelessness, and suicidality. Having makeshift female clothing removed by officers directly led to my suicide attempt in 2014 at the DeSoto Annex, and the self-castration attempt at the same facility in January 2015. It is torturous to be forced to wear men's underwear when you are a woman, and being unable to maintain the sort of feminine appearance I have throughout my entire adolescent and adult life because I cannot purchase any cosmetics and am forced to comply with male standards for hair length compounds the problem."); ECF 129-23 at 4 (transcribed at ECF 133 ¶ F.27) (describing need for social transition); ECF 129-23 at 11 (re-transcribed at ECF 133 ¶ F.28) (denying grievance appeal concerning social transition).

[5] *See* June 2017 Overall Inmate Record (Plaintiff's Trial Exhibit ("Ex.") 25) (ECF 137-12) at 2.

[6] *See* T1 at 42:1 – 43:9; ECF 3-1 ¶¶ 34, 36.

[7] ECF 3-1 ¶ 34.

[8] *See* T1 at 43:10-12; ECF 3-1 ¶ 35.

[9] *See* T1 at 43:13-18; ECF 3-1 ¶ 35.

Case No. 18-14096-HH, *Keohane v. Florida Department of Corrections Secretary*

sergeant said this was because "medical" said that she was not transgender.[10] This is consistent with an internal March 2016 email stating that she did "not classify under the transgender criteria."[11]

Dr. Dieguez told Ms. Keohane that she could not do anything for her regarding her request for treatment for gender dysphoria and that all she could do is refer her to the mental-health department.[12] Subsequently, around March 21, 2016, Ms. Keohane met with Andre Rivero in the mental-health department of Everglades CI.[13] Mr. Rivero told her that he agreed with the diagnosis of gender dysphoria and recommended hormone therapy, but he said that her symptoms could only be treated by the medical department.[14] He thus referred the matter back to the medical department, which had already said it would not provide hormone treatment.[15] That same week, Ms. Keohane's mental-health counselor, Sonele Baute, and her psychologist, Dr. Arnise Johnson, said that they agreed with the diagnosis and the appropriateness of hormone therapy for her.[16]

---

[10] ECF 3-1 ¶ 35; *see also* T1 at 43:19-22.
[11] *See* Ex. 27 (ECF 137-14).
[12] ECF 3-1 ¶ 36.
[13] *Id.* ¶ 37.
[14] *Id.*
[15] *Id.* ¶¶ 36-37.
[16] *Id.* ¶ 37.

Case No. 18-14096-HH, *Keohane v. Florida Department of Corrections Secretary*

Ms. Keohane's mental-health team at Everglades CI knew that social transition, including dressing and grooming in accordance with one's gender identity, was part of the standards of care for gender dysphoria.[17] Yet they did not evaluate whether Ms. Keohane had a need to access female clothing and grooming standards because DOC policy does not permit access to female clothing and grooming standards in male facilities.[18] Dr. Dieguez and the regional medical

---

[17] *See* Johnson Dep. (ECF 129-7) at 52:8 – 53:3; Rivero Dep. (ECF 129-11) at 23:8-15; Baute Dep. (ECF 129-3) at 17:4-8.

[18] Ms. Baute: *See* Baute Dep. (ECF 129-3) at 66:9-18 ("[Q] Did you ever make an assessment whether plaintiff has a treatment need to access female undergarments? A. No. Q. And is that because of DOC policy prohibiting that? A. Yes. Q. And is that the same with respect to her request to grow her hair longer than is permitted in male institutions? A. Yes."); *id.* at 52 ("Q. So if hormones are handled by medical, who would handle request for social transition, if anyone? A. Security."); *id.* at 65 ("I don't think there's a medical pass for social transition."); *id.* at 39 ("The rules in prison would not allow her to express herself as a female in a male institution.").

Mr. Rivero: *See* Rivero Dep. (ECF 129-11) at 73:4-11 ("Q. Did you discuss with anyone else whether she should be able to have access to panties or a bra? A. Yes, we did, the team. Q. And what did you say or what was said? A. That it is out of our hands, that we understand, but there's nothing we can do. Q. And why was there nothing you could do? A. I'm not DOC. I cannot make that decision."); *id.* at 45:24 – 47:7 ("Q. So are you suggesting that if a DOC policy prohibited something, that the Medical or Mental Health Departments could not override that? A. No, we cannot. Q. Are there medical passes that inmates can obtain for exceptions to DOC policies? A. Yes, they can, but psychiatry does not give any passes. They have to be given by medical. … Q. If they went to medical and asked for a pass, could it be for a psychiatric need? A. Like what? Q. Like gender dysphoria. A. What do you mean by that? Q. For example, if a psychiatrist believed that a transgender inmate could be at serious risk of suicide if she were not permitted an exception to a DOC policy as to hair length. A. If there is a risk of suicide, the patient would be sent to me and I would deal with it. Q. In that example I just gave you, how would you deal with it? A. What was the example? Q. The example was a psychiatrist felt that a transgender

Case No. 18-14096-HH, *Keohane v. Florida Department of Corrections Secretary*

director for Wexford, the private agency contracted to provide medical care to inmates in the region covering Everglades CI, Dr. Marlene Hernandez, also acknowledged the inability to get medical exceptions to the DOC's clothing and grooming policies.[19] Dr. Jose Santeiro, who was brought in to evaluate Ms. Keohane for purposes of defending this litigation, agreed.[20]

---

inmate would be at serious risk of suicide if she were not permitted an exception to the DOC policy on hair length. A. I cannot do anything for the hair length. I, however, can put the patient in SHOS, so the patient will not harm themselves.").

Dr. Johnson: *See* Johnson Dep. (ECF 129-7) at 95:25 – 96:9 ("A. If DOC prohibits [social transition], the mental health team will provide support and guidance and counsel and psychotherapy and support around what the client is allowed to have. … Q. But if social transitioning isn't permitted by DOC policy, it can't be considered as a treatment, correct? A. I guess."); *id.* at 98 ("[Q.] [L]et's say X inmate has a need for … access to female grooming standards or undergarments, that person wouldn't be allowed to have it under DOC policy; is that correct? A. Yes. [Objection.]"); *id.* at 116 ("Q. But … your team treating Reiyn never made an assessment of whether this would help Reiyn address her gender dysphoria because the prison policy takes it off the table, right? A. We've talked about how prison policy, our rub against what Reiyn says what he/she wants. … This is what she wants, but this is what DOC says she can have. How do we help her?").

[19] *See* Dieguez Decl. (ECF 27-1) ¶ 9; Hernandez Decl. (ECF 24-1) ¶ 8 ("At no time was I authorized to enforce or make an exception to any Department of Corrections policy."); Hernandez Dep. (ECF 42-1) at 32:18-33:6 ("it's up to security" whether to grant an exception to DOC policy).

[20] Santeiro Decl. (ECF 45-1) ¶ 9; *see also* Santeiro Dep. (Vol. II) (ECF 129-13) at 59, 60 (there's no such thing as a psychological pass).

Case No. 18-14096-HH, *Keohane v. Florida Department of Corrections Secretary*

In addition, Ms. Keohane's mental-health team at Everglades CI lacked the competence to assess treatment needs for gender dysphoria.[21] Order at 51.  The same is true of medical staff who saw her or reviewed her records.[22] Order at 51.

It was not until after two years of requests for treatment that the DOC began to provide her with hormone therapy. *Id.* at 12. This lawsuit was filed on August 15, 2016.[23] After the lawsuit was filed, the DOC referred Ms. Keohane to an outside endocrinologist, Dr. Eugenio Angueira-Serrano.[24] Dr. Angueira first saw her on September 2, 2016,[25] and prescribed her hormone therapy.[26]

Also following the filing of the lawsuit, psychiatrist Dr. Santeiro was asked by Wexford counsel to evaluate Ms. Keohane because of this lawsuit.[27] Dr.

---

[21] *See, e.g.*, Rivero Dep. (ECF 129-11) at 79:12-20 ("[Q] Would you ever recommend or say that a transgender inmate should be permitted to grow shoulder length hair? [Objection.] A. Why would I do that? [Q]. For example, if you felt that it was important to treat their gender dysphoria. A. I don't know."); *id.* at 22-23 (not familiar with WPATH standards); Johnson Dep. (ECF 129-7) at 103:20 – 104:4, 104:18-22 ("Q. Do you think Reiyn generally has a need for access to female undergarments and grooming standards to treat her GD? [Objection.] A. I don't know. … Q. You have no idea of whether or not she needs them? A. I don't know if I can make a determination about need in that respect, no. Me, personally, as a clinician in this respect, no.").

[22] *See* Hernandez Dep. (ECF 42-1) at 46:15-17 (not familiar with the standards of care); Dieguez Dep. (ECF 40-1) at 42:10-12, 49:19-21 ("[m]ore or less" familiar with the standards of care"; "not sure how serious" gender dysphoria is).

[23] *See* ECF 1.

[24] ECF 133 ¶ F.20.

[25] *Id.* ¶ F.21.

[26] *See id.* ¶ F.22.

[27] *See id.* ¶¶ F.30, F.32.

Case No. 18-14096-HH, *Keohane v. Florida Department of Corrections Secretary*

Johnson—the treating psychologist—had refused to do it.[28] Dr. Santeiro was not part of Ms. Keohane's treatment team,[29] and his role was limited to management of psychiatric medications,[30] although she has not been on such medications in DOC custody.[31]

Dr. Santeiro was specifically asked to evaluate Ms. Keohane's need for access to female clothing and grooming standards. Order at 12. After meeting with her on September 27, 2016, he concluded that she did not have a medical need for access to female clothing and grooming standards,[32] but the District Court found this conclusion "suspect for several reasons, including his admitted lack of experience treating gender dysphoria in prison, his lack of knowledge about the standards of care, and the limited information upon which he based his conclusion." *Id.*; *see also id.* at 43-47 (explaining further). He did not read most of her medical records (only those portions related to psychiatric medication, which she was not on).[33] He was not aware that she had past suicide attempts in prison or that one was related to denial of female undergarments and forced haircuts; nor was he aware that the incident where she cut her scrotum was also related to the denial of treatment for gender

---

[28] Santeiro Dep. (Vol. I) (ECF 129-12) at 68:17-22.

[29] *See id.* at 64:11-23.

[30] *Id.* at 21:7-9.

[31] ECF 133 ¶ F.33.

[32] *See* ECF 133 ¶¶ F.32, F.35; Santeiro Decl. (ECF 45-1) ¶ 7.

[33] ECF 129-12 at 80:20 – 83:1.

Case No. 18-14096-HH, *Keohane v. Florida Department of Corrections Secretary*

dysphoria.[34] He did not ask her how it affected her to be denied access to female

clothing and grooming standards; it was barely discussed.[35]

Ms. Keohane's hormone treatment continued. Female hormones cause a

transgender woman to have breast development, reduction in body hair, and changes

in body shape.[36] Around May 2017, while housed at Jefferson CI,[37] a physician

determined that is was medically necessary for Ms. Keohane to have a bra because

of her breast development resulting from her hormone treatment.[38] Since that time,

Ms. Keohane has worn a DOC-issued bra. To this day, however, the DOC still

wishes to refuse her access to female underpants or female grooming standards (the

female hair-length standard and permission to purchase and wear makeup).[39]

---

[34] *Id.* at 83:7-17, 108:3-19.

[35] *Id.* at 116:25 – 117:9 ("Q. When you met with her, did you talk to her about the impact of having her hair cut? A. No, didn't bring it up at all. So I didn't, like I said, I didn't open that can of worms. She did not bring it up, didn't discuss any of that with me. Q. Well, I thought you said she's the one who told you she was seeking access to female hair and clothing standards. A. Yeah, briefly at the beginning. Never brought it up again."); ECF 129-13 at 31 ("Q. Did you ask her how it -- how she feels having to wear male boxer shorts? A. No. Q. Did you ask her how it feels having to keep a short haircut? A. No."); 52-53.

[36] ECF 133 ¶ F.18; *see also* Angueira Dep. (ECF 129-2) at 30-31; T1 at 150-52.

[37] *See* Ex. 25 (ECF 137-12) at 2.

[38] ECF 133 ¶ F.13.

[39] Some officials attempt to use female pronouns when referring to Ms. Keohane, *see* T2 at 298:1-9, but others continue to use male pronouns, *see* T2 at 469:19 – 470:7.

Case No. 18-14096-HH, *Keohane v. Florida Department of Corrections Secretary*

Even if a psychologist or therapist did believe they could request an exception to the grooming and clothing standards for a gender dysphoric patient who has a need to socially transition, it is clear that Dr. Timothy Whalen, the DOC's Chief Clinical Officer, would not grant it. *See* Order at 34; *see also id.* at 33-35, 41, 52 (elaborating on Dr. Whalen's testimony).

### *The Harm to Ms. Keohane from the DOC's Failure to Treat her Gender Dysphoria*

By any measure, Ms. Keohane has been seriously harmed by the DOC's failure to adequately treat her gender dysphoria.[40] As explained below, she has attempted suicide on several occasions and attempted to self-castrate due to the lack of treatment for her gender dysphoria. The inability to live as a woman—and specifically, to wear female undergarments and groom as a woman—has contributed to a number of these instances of self-harm.

Early on in her incarceration with the DOC, in October 2014, Ms. Keohane attempted to hang herself because of the DOC's refusal to provide her with transition-related care, including the confiscation of makeshift bras and female underwear.[41] In January 2015, she attempted to remove her testicles following an

---

[40] *See, e.g.*, T1 at 33:1-12; ECF 3-1 ¶¶ 11, 20, 23-25, 29, 38, 41, 44-45; ECF 33-3 ¶¶ 2-5, 7-8, 11; ECF 105-1 ¶¶ 4, 8-10.
[41] *See* T1 at 33:16 – 35:23; ECF 3-1 at 5 ¶ 17; Ex. 11 (ECF 3-10).

Case No. 18-14096-HH, *Keohane v. Florida Department of Corrections Secretary*

officer threatening to confiscate her female undergarments and cut her hair.[42] She

was unable to complete this because her hands were shaking so badly.[43] She made

additional attempts to self-castrate by using a rubber band as a ligature around the

base of the testicles to cause necrosis, including one attempt in which she reported

tolerating the pain for five days.[44]

After one of several forced haircuts,[45] Ms. Keohane described feeling:

"[t]errible. Extremely depressed. Suicidal. ... I felt ... disgusted with
myself every time I would look at myself. At Everglades after that had
happened, I was pacing because of all of the just upset feelings. I
couldn't rest. I didn't sleep at all that night. But every time that I paced
by and saw the mirror in the cell, it just -- it was just like a sharp feeling
of distress, of that's not me. ... And it was so upsetting that … every
time I walked by, I punched the mirror until my hand started to swell
up, and at that point I decided the better idea would be to … cover up
the mirror so that when I continued to pace, I wouldn't have to see it."[46]

---

[42] *See* T1 at 36:11 – 38:22; Ex. 14 (ECF 3-11) (self-inflicted 3cm laceration of scrotum); Ex. 15 (ECF 33-1) ("'I'm upset because officer asked me to take off my bras, I cut my testicle.'"); Ex. 17 (ECF 137-9) ("INMATE CUT HIS TESTICLE ON 01-08-15 AFTER CONFLICT WITH SECURITY OVER DRESS STANDARDS (STUFFING HIS SHIRT TO MIMIC BREASTS). … THERE HAVE BEEN NUMEROUS INCIDENTS INVOLVING DRESS AND BEHAVIOR CONFLICTS."); ECF 3-1 at 7 ¶ 24.

[43] T1 at 38:4-10.

[44] T1 at 178-79.

[45] *See* T1 at 46:5 – 52:5, 65:12 – 66:16.

[46] *Id.* at 51:1-15; *see also* ECF 33-3 ¶ 7 (afterwards, she "very strongly considered many ways to hurt or kill [her]self"); ECF 129-8 at 82:21 – 83:8 (temporarily stopped going to breakfast because an officer there told her she better have her hair cut or he was going to give her one, and she feared what he would do).

Case No. 18-14096-HH, *Keohane v. Florida Department of Corrections Secretary*

The most recent of the forced haircuts, which coincided with a three-day disruption in access to her hormones,[47] occurred at SFRC. Before she left Everglades CI, she had her hair trimmed by a barber so that her hair would not be in violation.[48] Immediately upon her arrival at the SFRC, Ms. Keohane was told that she needed a haircut and was placed in confinement for refusing to get one after explaining that her hair was not in violation.[49] On April 8, 2017, she attempted to hang herself with a sheet from her bunk.[50] On the morning of April 10, 2017, she attempted suicide again by tying a pants leg around a door handle, tying the other leg around her neck, and sitting down on the floor to cut off the blood flow.[51]

On April 11, 2017, at SFRC, her hair was forcibly cut again.[52] She explained the lawsuit and how her hair wasn't in violation of DOC policy because it wasn't touching her ears or collar and was told her hair would be cut anyway because "while

---

[47] ECF 105-1 ¶ 9. As a result of being denied her medication for three days, she suffered withdrawal symptoms that included depression, fatigue, hot flashes, cold flashes, stomach cramps, diarrhea, and loss of appetite. *Id.* She also experienced disruptions in her hormone therapy—or serious risks of disruptions absent perseverant assertiveness on her part—on a number of other occasions. *See* ECF 129-23 at 1-3; T1 at 52:19-56:12.

[48] ECF 105-1 ¶ 2.

[49] *Id.*

[50] *See id.* ¶ 4.

[51] *See id.* ¶ 8.

[52] *Id.* ¶ 10.

Case No. 18-14096-HH, *Keohane v. Florida Department of Corrections Secretary*

you're in a male prison, you're going to look and act like a man."[53] She asked that if

they were going to cut it that they just trim it off the ears and collar.[54] Her head was

then shaved.[55] She again felt suicidal.[56]

The authoritative standards of care for treating gender dysphoria are those

published by the World Professional Association for Transgender Health

("WPATH"). Order at 7. The WPATH Standards include social transition, which

involves living one's life consistently with one's gender identity, including dressing

and grooming accordingly.[57] Order at 8.  These Standards apply in prison.[58] The

DOC, however, does not purport to follow the accepted standards of care for gender

dysphoria. Order at 33.

Suicidality and attempted self-treatment through self-castration (to eliminate

the source of testosterone) are common and predictable consequences of lack of

---

[53] *Id.*

[54] *Id.*

[55] *Id.*

[56] *See id.* at 5 ¶ 11.

[57] *See* Brown Dep. (ECF 129-4) at 101:6-9, 106:17 – 107:1; Brown Report (ECF 105-2) at 24; Angueira Dep. (ECF 129-2) at 18:3-5; Johnson Dep. (ECF 129-7) at 52:8 – 53:3; Rivero Dep. (ECF 129-11) at 23:8-15; Baute Dep. (ECF 129-3) at 17:4-8; Santeiro Dep. (Vol. I) (ECF 129-12) at 43:13-15; Levine Dep. (ECF 129-9) at 67:14-18, 167:21 – 168:1.

[58] This is specified in the WPATH Standards of Care and recognized by the National Commission on Correctional Healthcare (NCCHC). T1 at 153-56; T1 at 216-19; WPATH Standards of Care (ECF 3-16) at PDF pp.42-45; NCCHC, Transgender, Transsexual, and Gender Nonconforming Health Care in Correctional Settings (ECF 137-18).

Case No. 18-14096-HH, *Keohane v. Florida Department of Corrections Secretary*

appropriate treatment for gender dysphoria in prison.[59] Ms. Keohane's treating endocrinologist, Dr. Angueira, testified that inadequate treatment of gender dysphoria can lead to depression, anxiety, and suicidal ideation.[60] He further testified that some transgender women can have significant distress if unable to present as a female,[61] and that if Ms. Keohane is not permitted to grow her hair out or access female undergarments, there is a risk that she could self-harm again.[62] Dr. Angueira told Regional Medical Director Dr. Hernandez that he thought the ability for Ms. Keohane to grow her hair and wear a bra would be helpful for her and was surprised when Dr. Hernandez told him that the psychiatrist said it wasn't necessary.[63]

At present, the DOC is required to adhere to the District Court's injunction to provide Ms. Keohane with access to the DOC's female clothing and grooming standards. If that is taken away and she is prohibited from living as a woman for the next ten years of her sentence, there is a significant risk of serious decompensation of her mental state and that she will experience depression, sleep disruption, social withdrawal, inability to function, and a resumption of self-harm.[64] Defendant's

---

[59] *See, e.g.*, Brown Report (ECF 105-2) at 22-23.
[60] *See* Angueira Dep. (ECF 129-2) at 34-35; *see also* T1 at 165:19 – 167:22, 166-67.
[61] *See* Angueira Dep. (ECF 129-2) at 23-24.
[62] *See id.* at 32.
[63] *See id.* at 19-20.
[64] *See* T1 at 165:19-167:22; *see also* Brown Report (ECF 105-2) at 28 ("Failure to provide access to female grooming standards and female undergarments and canteen

Case No. 18-14096-HH, *Keohane v. Florida Department of Corrections Secretary*

expert, Dr. Levine, agreed that social transition, and specifically grooming and dressing as a woman, can help alleviate gender dysphoria,[65] and that it could be psychologically helpful[66] for Ms. Keohane to have access to female undergarments and grooming standards.[67] And Dr. Levine opined that if she is denied access to the hair length and clothing that she is seeking, she could be vulnerable to "acute decompensation,"[68] and would have "a suicidal ideation and crisis."[69]

In sum, Ms. Keohane has a serious medical need to socially transition in prison and, thus, to dress and groom as women incarcerated by the DOC may do.[70] This is "the *only* way it's even feasible for Ms. Keohane to express her gender identity." Order at 23. And, as summarized by the District Court, "[w]hat's clear from the treatment team's testimony is that everybody knows Ms. Keohane has

---

items will likely result in serious, dangerous, potentially life-threatening, medical and mental health outcomes for RK.").

[65] T2 at 386:8 – 387:5; *see also* T2 at 355:16 – 356:3, 359:19-23.

[66] Dr. Levine disagrees with the use of the term "medically necessary" to refer to social transition (including accessing female undergarments and grooming standards) because his understanding of that term is limited to things that physically affect the body and require a doctor to prescribe it. T2 at 360:19-361:1; Levine Dep. (ECF 128-9) at 105-108.

[67] *See* T2 at 401:3 – 402:4; Levine Report (ECF 105-4) at 11; Levine Dep. (ECF 129-9) at 88, 107, 108, 110. This was also recognized by her treating endocrinologist. Angueira Dep. (ECF 129-2) at 18:3-6; 19:15-20.

[68] T2 at 403:2-5; Levine Dep. (ECF 128-9) at 89-90.

[69] T2 at 403:6-9; Levine Dep. (ECF 128-9) at 265.

[70] *See, e.g.*, T1 at 162:11 – 163:1.

Case No. 18-14096-HH, *Keohane v. Florida Department of Corrections Secretary*

harmed herself and attempted suicide, but still, *nobody* has requested *any* exceptions to Defendant's male grooming and clothing policies to treat her gender dysphoria."[71]

### *The DOC's Clothing and Grooming Standards*

The DOC's hair-length policy for men's facilities requires a uniform look,[72] and the hair must be above the ear and collar.[73] There is essentially no restriction on hair length in DOC women's facilities.[74] Inmates at male facilities must cut their hair with the clippers and clipper guards provided by the DOC, not scissors.[75] The clippers and guards do not permit the hair to be cut any longer than 1.5 inches,[76] and maybe as little as a half inch.[77] Even assuming that a 1.5-inch cut would permit Ms. Keohane to create a feminine style, the DOC will not permit her to have a feminine hairstyle, even if her hair is above the ear and collar.[78]

The DOC clothing policy for women's facilities includes state-issued bras and female underpants.[79] The DOC clothing policy for men's facilities does not

---

[71] Order at 39; *accord, e.g.*, Baute Dep. (ECF 129-3) at 19:8-10, 50:8 – 61:9.

[72] *See* 30(b)(6) Dep. (ECF 129-1) at 198:17-20, 206:21 – 207:1, 207:6-19; *see also* T2 at 465:3-5 (haircut requires uniform length, two and a half to 3 inches).

[73] *See* Fla. Admin. Code r. 33-602.101(4); 30(b)(6) Dep. (ECF 129-1) at 197.

[74] *See* Kirkland Dep. (ECF 37-1) at 24:25 – 25:4. Inmates at women's facilities are not required to maintain one consistent hair length; if a new hair length drastically changes an inmate's appearance, the inmate would get a new ID card. *Id.* at 30.

[75] ECF 133 ¶ F.36; 30(b)(6) Dep. (ECF 129-1) at 202, 212, 215.

[76] *See* 30(b)(6) Dep. (ECF 129-1) at 212.

[77] *Cf. id.* at 202, 212:9-12.

[78] *See id.* at 203-08.

[79] *See* Fla. Admin. Code r. 33-602.101(2); 30(b)(6) Dep. (ECF 129-1) at 40.

Case No. 18-14096-HH, *Keohane v. Florida Department of Corrections Secretary*

permit bras or female underpants[80]—boxer shorts are provided.[81] Nevertheless, a

medical exception can be made for an inmate's need for the physical support of a

bra,[82] but not for a mental-health need.[83] This means that a transgender female

inmate who has breasts is allowed to have a sports bra.[84] Makeup is available for

purchase in the canteen in women's facilities but not in men's facilities.[85] Inmates at

men's facilities are not permitted to wear makeup,[86] and there is no medical

exception.[87]

### The DOC's Policies and Practices Concerning Treatment of Gender Dysphoria

Until October 2016, DOC policy included a provision that prohibited the DOC

from initiating hormone therapy for transgender inmates. This policy was reflected

in the immediately previous version of Procedure Number 602.053 and was the first

sentence of Specific Procedure 2(a)5.: "Inmates who have undergone treatment for

GD will be maintained only at the level of change that existed at the time they were

received by the Department." This language—colloquially known as a "freeze-frame

---

[80] *See* Fla. Admin. Code r. 33-602.101(2).
[81] *See, e.g.*, T1 at 33:3-5; ECF 3-6 at 12 (transcribed at ECF 3-1 ¶ 31).
[82] *See* 30(b)(6) Dep. (ECF 129-1) at 236:8-20.
[83] *Id.* at 81:16 – 82:2, 181:18-20.
[84] *Id.* at 39-40.
[85] ECF 133 ¶ F.37; 30(b)(6) Dep. (Kirkland) (ECF 129-1) at 229.
[86] ECF 133 ¶ F.38; 30(b)(6) Dep. (Kirkland) (ECF 129-1) at 229.
[87] *See* 30(b)(6) Dep. (ECF 129-1) at 77-81 (access to longer hair, women's underpants, bras (other than for physical support) and makeup are security issues, not medical issues).

Case No. 18-14096-HH, *Keohane v. Florida Department of Corrections Secretary*

policy"—was added to written DOC policy in December 2013.[88] That provision was deleted in the replacement Procedure Number 602.053 that was issued on October 14, 2016.[89]

Dr. Timothy Whalen is the DOC's Chief Clinical Officer[90] and has the final say on all medical and mental-health matters in the DOC.[91] He believes that mental-health counseling is the most appropriate treatment for a transgender female inmate who is at significant risk of suicide if she is not permitted access to female grooming standards.[92] He is not sure whether social transition diminishes the effects of gender dysphoria,[93] and he is not even fully convinced that hormone therapy does so.[94] He compared the provision of hormone therapy for gender dysphoria to offering diets to anorexics.[95] He believes gender dysphoria "probably" exists but is not 100% sure.[96] As a result, he does not view the WPATH standards as authoritative in part because he considers such treatments to "cause harm" and "go against nature."[97] He instead determines the standard of care based on his experience treating

---

[88] *See* Former Procedure 602.053 (ECF 3-15) at 6; 30(b)(6) (ECF 129-1) at 10:1.
[89] *See* Current Procedure 602.053 (ECF 129-22).
[90] ECF 133 ¶ F.39; Whalen Dep. (ECF 129-16) at 8.
[91] 30(b)(6) Dep. (ECF 129-1) at 111:24-112:15; ECF 133 ¶ F.40.
[92] 30(b)(6) Dep. (ECF 129-1) at 108:6-18; 114:21-25.
[93] *Id.* at 113:23 – 114:20.
[94] *Id.* at 118:14-18.
[95] T2 at 332:8-10.
[96] 30(b)(6) Dep. (ECF 129-1) at 119:2 – 120:23.
[97] T2 at 302:13-16.

Case No. 18-14096-HH, *Keohane v. Florida Department of Corrections Secretary*

approximately ten prisoners with gender dysphoria.[98] The DOC is not implementing

the WPATH Standards. Order at 33.

*Prison Safety*

Although security matters are not properly before this Court, *see infra* at 50-

51, Ms. Keohane will briefly discuss facts concerning prison safety and security.

Transgender women can be sexually targeted regardless of access to female

clothing and grooming standards.[99] Pursuant to the Prison Rape Elimination Act, the

DOC must assess transgender inmates biannually to determine whether there are any

safety issues to be addressed.[100]  The DOC can maintain the safety of transgender

women and maintain prison security generally even if transgender women are

provided access to female clothing and grooming standards; indeed, it is the DOC's

position that if having longer hair or female undergarments or makeup were deemed

to be medically necessary for an inmate with gender dysphoria, then the

accommodation would be provided.[101] Apart from segregation of the inmate, the

means the DOC has to protect that inmate include "overall security" ("[s]taffing,

observations, checks, video monitoring equipment"), presence of staff, institutional

---

[98] *Id.* at 303:11-14; T2 at 332:19-21.
[99] T1 at 241:17-20; *see also* T2 at 451:9-15.
[100] 30(b)(6) Dep. (ECF 129-1) at 34.
[101] 30(b)(6) Dep. (ECF 129-1) at 218-220, 225, 227, 230; Upchurch Dep. (ECF 129-15) at 60-62, 70-71.

29

Case No. 18-14096-HH, *Keohane v. Florida Department of Corrections Secretary*

transfer, different housing placement within the facility, or the segregation of another inmate.[102] Ms. Keohane's dormitory at Jefferson CI—designated for inmates 55+—reflects one possibility to keep her safe.[103]

Ms. Keohane's security expert addressed other asserted security issues raised by the DOC—the burden of searching long hair for contraband; the need to identify inmates; signaling gang affiliation through hairstyle; and preferential treatment.[104]

### *The DOC's Housing of Transgender Inmates*

Housing placements of transgender inmates in the DOC are not based just on genitals; rather, they are determined on a case-by-case basis based on the safety of the inmate and other inmates.[105] This means that transgender women could be placed at a female facility whether or not they have a penis.[106]

### D. Standard of Review

The entry of a permanent injunction is reviewed under an abuse-of-discretion standard, although the "underlying legal conclusion—that there was an Eighth Amendment violation warranting equitable relief—is reviewed *de novo.*" *Thomas v.*

---

[102] 30(b)(6) Dep. (ECF 129-1) at 252; *see also* T1 at 242:9 – 244:16; T2 at 435:10-14, 437:14-21; Upchurch Dep. (ECF 129-15) at 135; T2 at 451:6-8.

[103] *See* T1 at 70:18-23.

[104] *See* Subia Report (ECF 129-17) at 5-12; T2 at 237-59.

[105] 30(b)(6) Dep. (ECF 129-1) at 26-27. Dr. Dieguez and Mr. Kirkland instead believe that the housing of transgender inmates is based on genitals. *See* Kirkland Dep. (ECF 37-1) at 52:4-18, 53:12 – 54:17; *cf. also* Dieguez Dep. (ECF 40-1) at 52:24 – 53:8.

[106] *See* 30(b)(6) Dep. (ECF 129-1) at 26-28.

Case No. 18-14096-HH, *Keohane v. Florida Department of Corrections Secretary Bryant*, 614 F.3d 1288, 1303 (11th Cir. 2010). Issues of fact related to the Eighth Amendment claim are reviewed for clear error. *Id.*

Whether the case is moot (the voluntary-cessation issue) is a question of law reviewed de novo. *Troiano v. Supervisor of Elections in Palm Beach Cty., Fla.*, 382 F.3d 1276, 1282 (11th Cir. 2004). Related findings of fact are reviewed for clear error. *Id.*

## SUMMARY OF ARGUMENT

The District Court made several critical factual findings that resolve the Eighth Amendment issue in this case. The District Court found that Ms. Keohane had a serious medical need for social transition and, thus, access to the DOC's female clothing and grooming standards; that her treatment team denied this needed care not for medical reasons but, rather, because prison policy prohibited it; and that her treatment team was not competent treat gender dysphoria. Ms. Keohane grieved her needs far and wide, but DOC officials ignored her "deafening call for help." Order at 3. "[I]f Ms. Keohane's treatment in Defendant's custody isn't deliberate indifference, then surely there is no such beast." *Id.* at 4. The DOC does not contend that the court's findings are clearly erroneous; nor could it given the extensive evidentiary record. Rather, the DOC simply ignores these critical findings and presents legal arguments based on an alternative factual universe.

31

Case No. 18-14096-HH, *Keohane v. Florida Department of Corrections Secretary*

On voluntary cessation, the DOC ignores entirely the actual basis of the District Court's decision, which was that the change in policy concerning access to hormone therapy was not the result of substantial deliberation but rather an attempt to manipulate jurisdiction. The factual findings supporting this view are well supported and are not clearly erroneous.

Finally, the DOC's formalist arguments concerning certain requirements of the Prison Litigation Reform Act ignore that the District Court's ruling includes factual findings that address each of the PLRA's requirements.

## ARGUMENT

### I.    The District Court correctly held that the DOC has been and is deliberately indifferent to Ms. Keohane's serious medical need for treatment for gender dysphoria.

"A prison that deprives prisoners of basic sustenance, including adequate medical care, is incompatible with the concept of human dignity and has no place in civilized society." *Brown v. Plata*, 563 U.S. 493, 511 (2011). Under the Eighth Amendment, in a medical-necessity case "a prisoner must allege acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs." *Estelle v. Gamble*, 429 U.S. 97, 106 (1976).

### A. Ms. Keohane has a serious medical need for hormone therapy and for access to the DOC's female clothing and grooming standards.

As the DOC acknowledges in its opening brief, "[t]he case law is clear that gender dysphoria constitutes a serious medical need." Br. at 20 (PDF p.32).

Case No. 18-14096-HH, *Keohane v. Florida Department of Corrections Secretary*

Moreover, Ms. Keohane's specific medical need for access to hormone therapy is not in dispute. *See id.* at 7 (PDF p.19) (hormones "will be provided to plaintiff for as long as plaintiff's treatment team believes the hormones are medically necessary to treat her gender dysphoria"); *see also id.* at 28 (PDF p.40). But she also has a serious medical need to socially transition—specifically, to access the DOC's female undergarments and grooming standards. The Eighth Amendment requires that prisoners be provided with adequate medical care "based on an individualized assessment of an inmate's medical needs in light of relevant medical considerations." *Soneeya v. Spencer*, 851 F. Supp. 2d 228, 242 (D. Mass. 2012). Serious medical needs include the need for appropriate treatment of "psychiatric or mental health needs," *Kothmann v. Rosario*, 558 F. App'x 907, 910 (11th Cir. 2014), and are needs that "if left unattended, pose[] a substantial risk of serious harm," *Farrow v. West*, 320 F.3d 1235, 1243 (11th Cir. 2003).

Beyond the courts across the country that have recognized gender dysphoria as a serious medical need for the purposes of an Eighth Amendment claim, *e.g.*, *Fields v. Smith*, 712 F. Supp. 2d 830, 862 (E.D. Wis. 2010), *aff'd*, 653 F.3d 550 (7th Cir. 2011), several courts have also acknowledged social transition as part of a medical-necessity analysis with respect to this condition. In *Konitzer v. Frank*, 711 F. Supp. 2d 874, 908 (E.D. Wis. 2010), which involved a transgender prisoner's medical-necessity claim for access to female clothing and grooming standards, the

Case No. 18-14096-HH, *Keohane v. Florida Department of Corrections Secretary*

court denied the prison's motion for summary judgment, holding that "a reasonable jury could find that the defendants were deliberately indifferent to [the inmate's] serious medical need when they failed to provide . . . the real-life experience . . . ."[107] Further, *Soneeya* recognized a transgender inmate's medical need for female undergarments and female canteen items such as cosmetics. 851 F. Supp. 2d at 246, 248. Finally, the court in *Hicklin v. Precynthe* partially granted a preliminary injunction that in relevant part required the Missouri Department of Corrections to provide the plaintiff, a transgender female inmate, with access to gender-affirming canteen items. No. 4:16-cv-1357, 2018 WL 806764 (E.D. Mo. Feb. 9, 2018).

While an individualized assessment must be made to determine whether the particular treatment found by courts to be medically necessary for another inmate is necessary for Ms. Keohane, the evidence here shows that Ms. Keohane has a serious medical need to live in accordance with her gender identity by dressing and grooming accordingly, and that she suffered significant harm due to the DOC's refusal to allow it prior to the district court's permanent injunction.[108]

The DOC asserts two arguments against Ms. Keohane's claim of medical necessity. First, the DOC essentially maintains that denial of access to gender-specific clothing and grooming standards can *never* violate the Eighth

---

[107] The "real-life experience" is a term used to refer to the social-transition component of treatment for gender dysphoria. *See* Levine Dep. (ECF 129-9) at 16.
[108] *See supra* at 20–26.

Case No. 18-14096-HH, *Keohane v. Florida Department of Corrections Secretary*

Amendment—in other words, the claims are simply not cognizable. *See* Br. at 19 (PDF p.31) ("[R]estrictions on a prisoner's hair, clothing, or grooming standards are not sufficiently serious deprivations to trigger Eighth Amendment protections."); *id.* at 25-29 (PDF pp.37-41). But the cases relied on by the DOC do not assess Eighth Amendment claims for access to medical care.[109] Indeed, many of the cases did not even involve transgender prisoners,[110] and the ones that did either addressed clothing and grooming claims outside of the Eighth Amendment—for example, First

---

[109] Only one of the litany of cases cited by the DOC addresses a claim for access to makeup in the context of an Eighth Amendment medical-necessity claim. *See* Br. at 29 n.6 (PDF p.41 n.6) (citing *Arnold v. Wilson*, No. 1:13-cv-900, 2014 WL 7345755, at *3, 7 (E.D. Va. Dec. 23, 2014)). In *Arnold*, however, the court considered only one variant of the deliberate-indifference standard and found no deliberate indifference where the prison had implemented the WPATH standards. 2014 WL 7345755 at *6. Here, the DOC does not even purport to follow community standards for treating gender dysphoria. *See* 30(b)(6) Dep. (ECF 129-16) at 179:2-4. And while the *Arnold* court relied on the familiar rule that a simple disagreement between an inmate and a prison medical provider is not alone sufficient to establish an Eighth Amendment violation, *id.*, in this case, Ms. Keohane's treatment team did not make any medical judgment about the need for female undergarments and grooming standards because they understood that to be prohibited by DOC policy, *see supra* at 15-16.

[110] *LaBranch v. Terhune*, 192 F. App'x 653, 653-54 (9th Cir. 2006); *Larkin v. Reynolds*, 39 F.3d 1192, 1994 WL 624355, at *2 (10th Cir. 1994) (Table); *Blake v. Pryse*, 444 F.2d 218, 219 (8th Cir. 1971); *Taylor v. Gandy*, No. 11-cv-27, 2012 WL 6062058, at *4 (S.D. Ala. Nov. 15, 2012); *Casey v. Hall*, No. 2:11-cv-588-FTM-29SPC, 2011 WL 5583941, at *2 (M.D. Fla. Nov. 16, 2011); *Star v. Gramley*, 815 F. Supp. 276, 278 & n.2, 279 (C.D. Ill. 1993); *Jones v. Warden of Stateville Corr. Ctr.*, 918 F. Supp. 1142, 1145-46 (N.D. Ill. 1995).

Case No. 18-14096-HH, *Keohane v. Florida Department of Corrections Secretary*

Amendment or Equal Protection claims[111]—or Eighth Amendment claims where clothing and grooming standards were not part of medical-necessity analyses.[112] Here, however, the issue is the denial of medically necessary care. The DOC appears to continue to claim that Ms. Keohane's treatment team determined that access to female clothing and grooming standards is not medically necessary for the treatment of her gender dysphoria. *See* Br. at 10-11 (PDF p.22-23). Yet the district court found just the opposite. *See* Order at 13 ("[N]obody on Ms. Keohane's treatment team … has made a final treatment decision regarding access to female clothing and grooming standards. The primary rationale for not recommending such treatment or

---

[111] *Hood v. Dep't of Children & Families*, No. 2:12-cv-637-FTM-29, 2014 WL 757914, at *8 (M.D. Fla. Feb. 26, 2014); *Smith v. Hayman*, No. 09-cv-2602, 2010 WL 9488822, at *12-13 (D.N.J. Feb. 19, 2010).

[112] *Praylor v. Texas Dep't of Criminal Justice*, 430 F.3d 1208, 1208-09 (5th Cir. 2005), involved an Eighth Amendment claim, and the court denied the plaintiff's motion for a preliminary injunction seeking "hormone therapy and brassieres," but the court's medical-necessity analysis addressed only hormone therapy. In *Long v. Nix*, 877 F. Supp. 1358, 1365 (S.D. Iowa 1995), the court held that the inmate did not have a serious medical need for treatment for gender identity disorder, and thus the court did not address whether access to female clothing or grooming standards was medically necessary. In *DeBlasio v. Johnson*, 128 F. Supp. 2d 315 (E.D. Va. 2000), the Eighth Amendment claim was not even about medical care at all. Instead, the plaintiff contended that the hair-length policy violated the Eighth Amendment "because the severity of the repercussions an inmate faces for noncompliance are extreme." *Id.* at 325. Similar to *DeBlasio*, cosmetic products were addressed under the Eighth Amendment in *Murray v. U.S. Bureau of Prisons*, 106 F.3d 401, 1997 WL 34677, at *2-3 (6th Cir. 1997) (Table), but not under a medical-necessity analysis—a later section, labeled "Deliberate Indifference to Medical Needs," only discussed hormone therapy, not access to cosmetics or any other form of social transition.

Case No. 18-14096-HH, *Keohane v. Florida Department of Corrections Secretary*

seeking an exception to Defendant's security policies is that those same policies …

preclude social transitioning in prison."). This conclusion that a medical

determination was never made is a factual determination to which the DOC and this

Court must defer unless clearly erroneous. As discussed above (pp.15-16), Ms.

Keohane's treatment team—Dr. Johnson, Ms. Baute, and Mr. Rivero—never

evaluated her need for access to female clothing and grooming standards because

they understood that was not something that would be permitted, regardless of her

needs.[113]

Finally, beyond its factual determination that the treatment team never made

a finding of no medical need, the district court also made a factual determination that

the care *is* necessary. *See* Order at 58 (denial of such care "has caused Ms. Keohane

to continue to suffer unnecessarily and poses a substantial risk of harm to her

health"). That determination is also due deference, *see Stitzel v. New York Life Ins.

Co.*, 361 F. App'x 20, 28 (11th Cir. 2009) (in insurance case, noting that medical

necessity "is a factual determination that falls squarely within the province of the

jury"), and is fully supported by the facts laid out above.

---

[113] The assessment of Dr. Santeiro, who was not part of Ms. Keohane's treatment
team but was asked by Wexford counsel to evaluate her for purposes of defending
this litigation, cannot be credited for the reasons discussed previously. *See supra* at
18-19; *accord* Order at 46-47.

Case No. 18-14096-HH, *Keohane v. Florida Department of Corrections Secretary*

For these reasons, Ms. Keohane has a medical need for access to the DOC's female clothing and grooming standards.

### B. The Court did not err in concluding that denying Ms. Keohane the ability to socially transition by prohibiting her from following the DOC's female clothing and grooming standards constitutes deliberate indifference.

Deliberate indifference can be shown in numerous ways. This Court has explained:

> To establish deliberate indifference, a plaintiff must show "(1) a subjective knowledge of a risk of serious harm; (2) disregard of that risk; and (3) by conduct that is more than mere negligence." *Brown v. Johnson*, 387 F.3d 1344, 1351 (11th Cir. 2004). Conduct that is more than mere negligence includes: (1) knowledge of a serious medical need and a failure or refusal to provide care; (2) delaying treatment for non-medical reasons; (3) grossly inadequate care; (4) a decision to take an easier but less efficacious course of treatment; or (5) medical care that is so cursory as to amount to no treatment at all. *McElligott v. Foley*, 182 F.3d 1248, 1255 (11th Cir. 1999).

*Baez v. Rogers*, 522 F. App'x 819, 821 (11th Cir. 2013). Regarding subjective knowledge of risk and disregard of that risk, the District Court appropriately found that "[w]hat's clear from the treatment team's testimony is that everybody knows Ms. Keohane has harmed herself and attempted suicide, but still, *nobody* has requested *any* exceptions to Defendant's male grooming and clothing policies to treat her gender dysphoria"[114]—even though they knew that social transition is part

---

[114] Order at 39.

Case No. 18-14096-HH, *Keohane v. Florida Department of Corrections Secretary*

of the Standards.[115]  As to the third element, the DOC's blanket ban on access to

female clothing and grooming standards for non-medical reasons (not addressed in

the DOC's brief at all), as well as its lack of competency to provide the treatment

and failure to follow community standards constitute conduct that is more than mere

negligence.

### 1.    Blanket Bans on Treatment

The denial of treatment for non-medical reasons constitutes deliberate

indifference to a serious medical need. *Baez,* 522 F. App'x at 821; *see also Ancata*

*v. Prison Health Servs., Inc.*, 769 F.2d 700, 704 (11th Cir. 1985).  Given the Eighth

Amendment's requirement that individualized assessment be performed to

determine appropriate care for an inmate, court have routinely held that blanket bans

on certain forms of medical treatment regardless of medical need violate the Eighth

Amendment. *See, e.g.*, *Colwell v. Bannister*, 763 F.3d 1060, 1063, 1068 (9th Cir.

2014) (holding that the "blanket, categorical denial of medically indicated surgery

solely on the basis of an administrative policy that one eye is good enough for prison

inmates is the paradigm of deliberate indifference") (quotations omitted); *Johnson*

*v. Wright*, 412 F.3d 398, 406 (2d Cir. 2005) (denial of hepatitis C treatment to a

prisoner based on a policy that a particular drug could not be administered to inmates

with recent history of substance abuse could constitute deliberate indifference if

---

[115] *See supra* n.17.

39

Case No. 18-14096-HH, *Keohane v. Florida Department of Corrections Secretary*

relied upon without consideration of individual medical need); *Mahan v. Plymouth Cty. House of Corr.*, 64 F.3d 14, 18 & n.6 (1st Cir. 1995) (suggesting that "inflexible" application of prescription policy may violate Eighth Amendment); *Monmouth Cty. Corr. Institutional Inmates v. Lanzaro*, 834 F.2d 326, 347 & n.32 (3d Cir. 1987) (by virtue of a blanket policy, "the County denies to a class of inmates the type of individualized treatment normally associated with the provision of adequate medical care"); *Jorden v. Farrier*, 788 F.2d 1347, 1348-49 (8th Cir. 1986) (citing with approval case holding that application of prison medication policies must be instituted in manner that allows individualized assessments of need).

This principle is no different with respect to treatment for gender dysphoria: as numerous courts have recognized, automatic exclusions of certain forms of treatment for gender dysphoria violate the Eighth Amendment. *See Fields v. Smith*, 653 F.3d 550, 559 (7th Cir. 2011) (state law that barred hormone therapy and gender-confirming surgery as possible treatments for prisoners with gender identity disorder facially violated the Eighth Amendment); *De'lonta v. Angelone* (*De'lonta I*), 330 F.3d 630, 634-35 (4th Cir. 2003) (prisoner with gender identity disorder stated a claim for deliberate indifference where the Department of Corrections withheld hormone therapy pursuant to a categorical policy against providing such treatment rather than based on individualized medical judgment); *see also Allard v. Gomez*, 9 F. App'x 793, 795 (9th Cir. 2001) ("[T]here are at least triable issues as to whether

Case No. 18-14096-HH, *Keohane v. Florida Department of Corrections Secretary*

hormone therapy was denied Allard on the basis of an individualized medical evaluation or as a result of a blanket rule, the application of which constituted deliberate indifference to Allard's medical needs."); *Soneeya*, 851 F. Supp. 2d at 249, 253 (holding that a prison policy that "removes the decision of whether sex reassignment surgery is medically indicated for any individual inmate from the considered judgment of that inmate's medical providers" violated Eighth Amendment); *Houston v. Trella*, No. 2:04-cv-1393, 2006 WL 2772748, at *8 (D.N.J. Sept. 22, 2006) (claim that prison doctor's decision not to provide hormone therapy to prisoner with gender identity disorder based not on medical reason but policy restricting provision of hormones stated viable Eighth Amendment claim); *Barrett v. Coplan*, 292 F. Supp. 2d 281, 286 (D.N.H. 2003) ("A blanket policy that prohibits a prison's medical staff from making a medical determination of an individual inmate's medical needs [for treatment related to gender identity disorder] and prescribing and providing adequate care to treat those needs violates the Eighth Amendment."); *Brooks v. Berg*, 270 F. Supp. 2d 302, 312 (N.D.N.Y. 2003) (prison officials cannot deny inmates medical treatment for gender identity disorder based on a policy of limiting such treatments to inmates who were diagnosed prior to incarceration), *vacated in part on other grounds*, 289 F. Supp. 2d 286 (N.D.N.Y. 2003).

Case No. 18-14096-HH, *Keohane v. Florida Department of Corrections Secretary*

Here, through its refusal to allow access to its female clothing and grooming standards for the treatment of gender dysphoria, the DOC has a blanket ban on inmates in male facilities being permitted to dress and groom in accordance with their female gender identity pursuant to the accepted protocols for treating gender dysphoria.[116] Moreover, as noted above, the District Court found that Ms. Keohane's treatment team did not determine whether social transition is medically necessary for her. Order at 13. The individuals responsible for her care understood that they had no authority to make exceptions to DOC policy to allow her to obtain female undergarments or access female grooming standards, and even if a psychologist or therapist did believe they could request such an exception for a gender dysphoric patient who has a need to socially transition, Dr. Whalen made clear he would not grant it.[117]

The DOC's refusal to permit Ms. Keohane to socially transition by denying her access to female clothing and grooming standards was not a decision based on medical judgment. Ms. Keohane has therefore established deliberate indifference.

### 2.    Lack of Competency and Failure to Meet Community Standards

---

[116] *See supra* at 26-29.
[117] *See supra* at 15-16, 20.

Case No. 18-14096-HH, *Keohane v. Florida Department of Corrections Secretary*

Deliberate indifference can also be found by showing that the providers were simply not competent to provide the care, *Harris v. Thigpen*, 941 F.2d 1495, 1509 (11th Cir. 1991) (Eighth Amendment violation "could well be present if the care received by the prisoners, when measured against general professional standards, rose to such a level of gross incompetence that it manifested deliberate indifference"), or that an inmate has been "denied access to medical personnel capable of evaluating the need for treatment," *Ancata*, 769 F.2d at 704 (quotations omitted); *see also Waldrop v. Evans*, 871 F.2d 1030, 1036 (11th Cir. 1989) ("[P]rison officials have an obligation to take action or to inform *competent* authorities once the officials have knowledge of a prisoner's need for medical or psychiatric care.") (emphasis added). The Eighth Amendment guarantees medical care "at a level reasonably commensurate with modern medical science and of a quality acceptable within prudent professional standards." *United States v. DeCologero*, 821 F.2d 39, 43 (1st Cir. 1987); *see also Moore v. Duffy*, 255 F.3d 543, 545 (8th Cir. 2001) (Medical treatment may not "so deviate from the applicable standard of care as to evidence a physician's deliberate indifference.").

With respect to competency, here again the District Court made a factual determination that resolves the issue. Specifically, the court found that "Defendant denied Ms. Keohane access to minimally competent medical personnel capable of determining her treatment needs." Order at 35. The record strongly supports this

Case No. 18-14096-HH, *Keohane v. Florida Department of Corrections Secretary*

finding,[118] and the DOC does not even attempt to refute it. That alone supports affirmance of the decision below.

Finally, with respect to community standards, the well-accepted standards for treatment of gender dysphoria include social transition, which involves living in accordance with one's gender identity by, among other things, dressing and grooming accordingly.[119] The District Court made several factual findings relevant to this strand of deliberate indifference: (1) the DOC "doesn't recognize or permit social transitioning in its facilities"; (2) the DOC doesn't follow the WPATH Standards of Care; and (3) the WPATH Standards are "authoritative in the treatment of gender dysphoria." Order at 54.

The DOC's response to this is not entirely clear. Although an entire section of the brief is entitled, "The district court erred in finding FDC failed to meet community standards," Br. at 38-46 (PDF pp.50-58), the DOC neither follows the WPATH Standards nor offers competing community standards. And it is further not clear, for example, what the DOC actually thinks of the WPATH Standards. On the one hand, at trial, the DOC's 30(b)(6) deponent rejected them. *See* 30(b)(6) Dep. (Whalen) (ECF 129-1) at 115:4-7 ("Q. So you see the standards of care as being driven not by medical or mental health concerns, but by the concerns of advocates

---

[118] *See supra* at 13-20.
[119] *See supra* at 23.

Case No. 18-14096-HH, *Keohane v. Florida Department of Corrections Secretary*

for transgender people? A. Correct."); *id.* at 170:4-23 (dismissing any position that the American Medical Association or American Psychiatric Association might have on the standards of care because "[t]hey're basically political arms . . . [o]f physicians and psychiatrists"). However, the DOC's opening appellate brief appears to recognize that that the WPATH standards are the accepted community standards for treating gender dysphoria. *See.* Br. at 36 (PDF p.48) ("Plaintiff's experts simply argue that dressing, grooming, and presenting oneself to others in accordance with one's gender identity is part of the treatment protocols under the WPATH Standards of Care. But the test under the Eighth Amendment is not whether the treatment provided is perfectly commensurate with *the most up-to-date medical recommendations* ….") (emphasis added; citation omitted). The DOC's attorneys appear to accept that the WPATH Standards have something to say about the treatment of transgender people. But the DOC thinks, remarkably, that the Standards do not address what should be done in a prison setting. *See* Br. at 44, 45 (PDF pp.56, 57) ("Neither Dr. Brown nor the WPATH standards provides any guidance on where the constitutional line should be drawn for acceptable gender presentation in a prison setting."; "There is no evidence that FDC was aware (or even should have been aware) that long hair, make-up, or female underwear are inherently required for the

Case No. 18-14096-HH, *Keohane v. Florida Department of Corrections Secretary*

treatment of gender dysphoria.[120] Neither the WPATH nor NCCHC standards

discusses those things in this context.[121]"). Actually, the Standards do address the

applicability of the standards in prisons, in a section entitled, "Applicability of

Standards of Care to People Living in Institutional Environments." ECF 3-16 at PDF

pp. 42-43 (care provided in institutions should be the same as in non-institutional

settings).

What is clear, however, is that other courts—like the District Court below—

have accepted the WPATH standards in prison cases. *See, e.g.*, *De'lonta v. Johnson*

(*De'lonta II*), 708 F.3d 520, 522-23 (4th Cir. 2013); *Lynch v. Lewis*, No. 7:14-cv-

24, 2015 WL 1296235, at *10 (M.D. Ga. Mar. 23, 2015); *Soneeya*, 851 F. Supp. 2d

at 231; *Fields*, 712 F. Supp. 2d at 844.[122] Moreover, while the DOC asserts that there

is "no evidence suggesting that hair length, make-up, underwear, or anything else in

particular is 'standard' for the treatment of gender dysphoria," Br. at 44 (PDF p.56),

it can scarcely dispute that social transition is "standard." The WPATH Standards of

Care list four types of treatment for individuals seeking care for gender dysphoria,

and social transition is the first one listed. *See* ECF 3-16 at PDF p.7 (listing treatment

options as (1) "*Changes in gender expression and role* (which may involve living

---

[120] Ms. Keohane, of course, did not argue this.

[121] The DOC does not say what "this" context means, but presumably it means the prison context.

[122] *Cf. Glenn v. Brumby*, 724 F. Supp. 2d 1284, 1289 n.4 (N.D. Ga. 2010) (recognizing that WPATH Standards are accepted in the medical community).

Case No. 18-14096-HH, *Keohane v. Florida Department of Corrections Secretary*

part time or full time in another gender role, consistent with one's gender identity";
(2) hormones; (3) surgery; and (4) psychotherapy "*for purposes such as exploring
gender identity, role, and expression* ...") (emphasis added). Nowhere do the
WPATH Standards minimize the importance of social transition, as the DOC's
remark would suggest. *See id.* at 6-7 ("Often with the help of psychotherapy, some
individuals integrate their trans- or cross-gender feelings into the gender role they
were assigned at birth and do not feel the need to feminize or masculinize their body.
*For others, changes in gender role and expression are sufficient to alleviate gender
dysphoria*. Some patients may need hormones, a *possible change in gender role*, but
not surgery; others may need a *change in gender role* along with surgery but not
hormones."). To suggest, as the DOC wishes the Court to conclude, that social
transition is not "standard" treatment for gender dysphoria, is to deliberately misread
the WPATH Standards.[123]

For the reasons noted above, the DOC does not even purport to follow the
community standards of care for gender dysphoria.[124] Ms. Keohane has therefore
shown that the DOC is deliberately indifferent to her serious medical needs.

---

[123] The DOC refers to some of Ms. Keohane's requests (it does not specify which)
as "cosmetic," Br. at 39 (PDF p.51), which suggests it rejects social transition as
medical care, contrary to the testimony of its own expert.
[124] *See supra* at 23.

Case No. 18-14096-HH, *Keohane v. Florida Department of Corrections Secretary*

### 3.    Providing some treatment does not negate the deliberate indifference shown here.

The DOC contends that the treatment it is currently providing voluntarily is sufficient to show that it is not deliberately indifferent to Ms. Keohane's care. Specifically, the DOC says that it is treating Keohane's gender dysphoria in the following ways: "hormone therapy; mental health counseling; provision of a bra; use of female pronouns; private shower use; and housing assignments designed to be as safe as possible." Br. at 17 (PDF p.29). "But just because [the DOC] ha[s] provided [Plaintiff] with *some* treatment consistent with the … Standards of Care, it does not follow that they have necessarily provided her with *constitutionally adequate* treatment." *De'lonta II*, 708 F.3d at 526 (alterations added; emphasis in original); *see also Dunn v. Dunn*, 219 F. Supp. 3d 1100, 1126 (M.D. Ala. 2016) ("Although the Eighth Amendment is not violated merely because a prisoner receives less than ideal health care, the Eleventh Circuit has repeatedly recognized that even when some care is provided, 'deliberate indifference may be established by a showing of grossly inadequate care as well as by a decision to take an easier but less efficacious course of treatment.'"). The question is not whether her symptoms are alleviated in any way whatsoever but rather whether her medical need is being addressed to such an extent that she is no longer at substantial risk of harm. As the facts outlined above demonstrate, the care provided was not sufficient to adequately address Ms. Keohane's dysphoria. *See supra* at 20-26.  Being forced to cut her hair short and

Case No. 18-14096-HH, *Keohane v. Florida Department of Corrections Secretary*

otherwise groom as a man and wear men's boxer shorts prevents her from living and seeing herself as a woman, causing her severe distress that cannot be alleviated without access to female undergarments and grooming standards.

As an aside, Ms. Keohane also feels compelled to address the repeated, misleading references to bras and pronouns. A breezy review of the DOC's brief suggests that the DOC wishes this Court to infer that the DOC is providing a bra for "gender presentation purposes," *see* Br. at 40 (PDF p.52)—in other words, to treat Ms. Keohane's gender dysphoria—but a careful review reveals that the brief actually does not say that gender presentation is the reason that the bra is being provided. And, in fact, the DOC has maintained throughout this litigation that the bra is *not* being provided for mental-health purposes to treat gender dysphoria but rather because Ms. Keohane developed breasts and needed the bra for physical support.[125] Indeed, the DOC specifically *refused* to provide Ms. Keohane a bra to treat her gender dysphoria before she developed breasts.[126]

The DOC's references to pronouns are also off the mark. Ms. Keohane was genuinely surprised to read about the purported assiduousness with which pronouns are being addressed, as indicated by the prominent focus on pronouns in the DOC's opening brief. It does not reflect the record, much less reality. The DOC says that it "is working to ensure that Keohane is referred to with female pronouns," Br. at 39

---

[125] *See, e.g.*, 30(b)(6) Dep. (ECF 129-1) at 81:16 – 82:2, 181.

[126] *Cf.* T1 at 76:19 – 78:1, 189:19-22; Keohane Dep. (ECF 129-8) at 133:23 – 134:23.

Case No. 18-14096-HH, *Keohane v. Florida Department of Corrections Secretary*

(PDF p.51), but the citation provided merely says that the DOC is "trying to make

that attempt,"[127] and Ms. Keohane's own testimony was that "over 90 percent of the

time staff and officers refer to me by male pronouns."[128]

### C. The DOC's pretrial stipulation concerning security issues takes that justification for the denial of treatment off the table.

Before concluding the discussion of social transition, one further issue must

be addressed. Littered throughout the DOC's brief are references to the District

Court's purported failure "to adequately consider FDC's clearly-articulated security

concerns in this case."[129] To be sure, the parties expended a substantial amount of

resources during discovery on all matter of asserted security concerns set forth by

various witnesses. But as the District Court explained:

> [A]fter denying treatment based on its security policies—and offering
> expert witnesses to testify to myriad security concerns—Defendant
> abandoned this red herring on the eve of trial with its stipulation that if
> the requested treatments are medically necessary, they'll be provided
> with added security measures. Having so stipulated, Defendant is now
> put to that task.

Order at 60. The District Court was referring to the parties' pre-trial stipulation,

which said: "It is FDOC's position that if having longer hair or female

undergarments or makeup were deemed to be medically necessary for an inmate

---

[127] T2 at 298:9.

[128] Keohane Dep. (ECF 129-8) at 111:16-17; *see also* T2 at 469:19 – 470:7.

[129] Br. at 18 (PDF p.30); *accord, e.g.*, *id.* at 52 (PDF p.64).

Case No. 18-14096-HH, *Keohane v. Florida Department of Corrections Secretary*

with gender dysphoria, then the accommodation would be provided, with additional security measures taken if necessary." [130] That stipulation begins and ends the discussion of security in this case. Perhaps a future case will offer this Court the opportunity to address the extent to which security interests affect—if at all—the provision of medically necessary care in prison. This case does not.

## II. The District Court correctly held that the DOC failed to meet its burden under the voluntary-cessation standard.

"[W]hen a defendant chooses to end a challenged practice, this choice does not always deprive a federal court of its power to decide the legality of the practice." *Doe v. Wooten*, 747 F.3d 1317, 1322 (11th Cir. 2014). The defendant "bears the formidable burden of showing that it is absolutely clear the allegedly wrongful behavior could not reasonably be expected to recur." *Id.* "[T]his Court often gives government actors more leeway than private parties in the presumption that they are unlikely to resume illegal activities"—"a 'rebuttable presumption' or a 'lesser burden.'" *Id.* (citations omitted).

> [W]e emphasize that the government actor is entitled to this presumption only *after* it has shown unambiguous termination of the complained of activity.
>
> In conducting both the initial inquiry of unambiguous termination as well as the following evaluation about whether there is a reasonable basis the challenged conduct will recur, this Court has considered the following factors: (1) whether the termination of the offending conduct

---

[130] ECF 133 at 11.

Case No. 18-14096-HH, *Keohane v. Florida Department of Corrections Secretary*

> was unambiguous; (2) whether the change in government policy or conduct appears to be the result of substantial deliberation, or is simply an attempt to manipulate jurisdiction; and (3) whether the government has consistently applied a new policy or adhered to a new course of conduct. The timing and content of the cessation decision are also relevant in evaluating whether the defendant's stopping of the challenged conduct is sufficiently unambiguous.

*Id.* at 1322-23 (citations and internal quotation marks omitted).

### A. The DOC misstates the basis of the District Court's decision.

After reading the DOC's discussion of voluntary cessation, Br. at 47-49 (PDF pp.59-61), one is left with the impression that the District Court based its voluntary-cessation ruling on Ms. Keohane's Trial Exhibit 26, which was a grievance response that used language mimicking the freeze-frame policy that—as a formal matter at least—had already been repealed. The problem is, this impression is demonstrably false. The District Court explicitly *rejected* any meaningful reliance on Ms. Keohane's proffered exhibit. *See* Order at 18 ("Nonetheless, this drop of evidence only adds to the tidal wave of other circumstances crashing down on Defendant's mootness argument."). The District Court did not rely on the exhibit that the DOC suggests it did. The District Court instead focused its discussion on the lack of "unambiguous termination."

### B. On these facts, the DOC's policy change does not entitle it to the rebuttable presumption typically afforded to government actors.

"Unambiguous termination" is a term of art. The DOC appears to equate that with an "unambiguous change in procedure," Br. at 49 (PDF p.61), but that is not the

Case No. 18-14096-HH, *Keohane v. Florida Department of Corrections Secretary*

standard. There is no dispute that the freeze-frame policy was repealed as a formal matter, but the DOC's brief pretends that that is the issue, and it ignores entirely the actual basis for the District Court's decision, which was that—*even though* the policy was formally changed—the DOC nevertheless failed to meet the "unambiguous termination" standard because the change was not the result of substantial deliberation and was instead an attempt to manipulate jurisdiction. *See* Order at 18 ("While often a clear indicator of an unambiguous termination, the change in official policy is little help for Defendant given the other circumstances before this Court."); *id.* at 18-21. Because the DOC offers literally not one word in response to the actual basis for the District Court's decision on voluntary cessation, there is nothing for Ms. Keohane to say except to refer the Court back to the District Court's reasons for finding that "Defendant's voluntary cessation was an attempt to manipulate jurisdiction—certainly *not* the result of substantial deliberation." [131] Those findings are not clearly erroneous, which is what the DOC must show in this appeal in order to prevail on the voluntary-cessation issue.

## III. The District Court's Order satisfies the requirements of the Prison Litigation Reform Act.

The DOC attacks the District Court's Order as violating the Prison Litigation Reform Act ("PLRA") because the Order does not call out the PLRA by name; allegedly creates a "blanket policy," despite issuing an injunction that applies only

---

[131] *Id.* at 19; *see also id.* at 18-21 (elaborating on this finding).

Case No. 18-14096-HH, *Keohane v. Florida Department of Corrections Secretary*

to Ms. Keohane; and ignores public safety, despite the DOC's own stipulation on security. A narrow injunction that applies only to specific inmates (as opposed to system-wide relief), balances the DOC's administration of own affairs with needs of inmates, and does not require onerous supervision by court is appropriate under PLRA. *See Thomas*, 614 F.3d at 1324-25. The Order below meets these requirements.

### A. The Order includes the need, narrowness, and intrusiveness findings required by the PLRA.

The PLRA requires that a court find that any granted prospective relief regarding prison conditions is "narrowly drawn, extends no further than necessary to correct the violation of the Federal right, and is the least intrusive means necessary to correct the violation of the Federal right." 18 U.S.C. § 3626(a)(1)(A). Here, the injunctive relief granted to Ms. Keohane was necessary, the relief granted extended only as far as necessary to correct the Eighth Amendment violation, and the injunction was not intrusive given the DOC's stipulation. The DOC incorrectly attempts to impose an additional requirement that the Court utilize certain linguistic incantations to meet the requirements of the PLRA.

It is not, however, specific language that determines whether a court has met the requirements of the PLRA, but rather the court's findings. *See Johnson v. Breeden*, 280 F.3d 1308, 1326 (11th Cir. 2002); *see also Fields*, 653 F.3d at 558 (no requirement that specific language be used by the court to comply with the PLRA,

Case No. 18-14096-HH, *Keohane v. Florida Department of Corrections Secretary*

but only that the court evaluated the record as a whole and identified evidence supporting the scope of the injunction); *Armstrong v. Schwarzenegger*, 622 F.3d 1058, 1070 (9th Cir. 2010) ("[T]he language of the PLRA does not suggest that Congress intended a provision-by-provision explanation of a district court's findings"); *Gates v. Cook*, 376 F.3d 323, 336 n.8 (5th Cir. 2004) (a court does not need to make particularized findings on a provision-by provision basis that an injunction meets the requirements of the PLRA); *Benjamin v. Fraser*, 343 F.3d 35, 49 (2d Cir. 2003) (district court's findings sufficient to meet requirements of PLRA despite district court's incorrect finding that needs-narrowness-intrusiveness test did not apply to ordered relief), *overruled in part on other grounds in Caiozzo v. Koreman*, 581 F.3d 63 (2d Cir. 2009). The DOC unnecessarily seeks to have the order remanded for specific wording naming the PLRA to be added to the order, when no specific wording is necessary and the Order's substance fulfills the District Court's obligations under the PLRA.

> **1.    The Court found that providing Ms. Keohane with hormones and access to female clothing and grooming standards was necessary.**

The District Court's Order is replete with findings that the injunction requiring the DOC to provide Ms. Keohane access to female clothing and grooming standards and to continue providing Ms. Keohane hormone therapy as long as not medically contraindicated is necessary to correct the DOC's violation of the Eighth Amendment. The District Court found that Ms. Keohane's request for hormone

Case No. 18-14096-HH, *Keohane v. Florida Department of Corrections Secretary*

therapy was medically necessary and not moot. Order at 20-21, 25-31. The District Court also found that access to female clothing and grooming standards was medically necessary. Order at 51, 58. The DOC cannot maintain that the District Court did not make findings regarding the necessity of its injunctive relief.

### 2.    The relief ordered was narrowly drawn.

The DOC makes the baffling and incorrect argument that the District Court's Order creates a blanket policy for all transgender female prisoners. To begin, the District Court's Order directs the DOC to provide treatment only to Ms. Keohane, not to other prisoners. The District Court did not create a "blanket policy" but instead noted repeatedly throughout its order that treatment for gender dysphoria should be individualized. *Id.* at 7, 22, 32.[132] Nor does the District Court's Order extend beyond what is necessary to correct the constitutional violation. The District Court ordered the DOC to provide hormone therapy that was already being provided and that the DOC assured the Court it would continue to provide. *Id.* at 25. The District Court also found that providing Ms. Keohane with access to female undergarments and female grooming standards were "minor accommodations" and "the *only* way it's even feasible for Ms. Keohane to express her gender identity." *Id*. at 58, 57. The injunctive relief is narrowly tailored to correct the constitutional violations, no more.

---

[132] For example, the District Court noted that "Not everyone diagnosed with gender dysphoria wants or needs hormone therapy." *Id.* at 25.

Case No. 18-14096-HH, *Keohane v. Florida Department of Corrections Secretary*

> ### 3.    The District Court ordered the least intrusive means to correct the DOC's violation.

The DOC cannot claim that the District Court's Order is more intrusive than necessary when it requires only what the DOC assured the District Court it would provide if deemed medically necessary. The DOC assured the District Court that it would continue to provide hormone therapy to Ms. Keohane as long as it is deemed necessary to treat her gender dysphoria. *Id.* at 25; ECF 133 at 3. The DOC stipulated that "if having longer hair or female undergarments or makeup were deemed to be medically necessary for an inmate with gender dysphoria, then the accommodation would be provided, with additional security measures taken if necessary." ECF 133 at 11. To now claim that the Court's directive is intrusive is simply disingenuous.

> ## B. The final order gives appropriate "weight to any adverse impact on public safety," because the DOC explicitly waived reliance on a security defense.

The District Court appropriately considered any adverse impact on public safety in fashioning relief for Ms. Keohane by deferring to the DOC. The PLRA requires that a court "give substantial weight to any adverse impact on public safety or the operation of a criminal justice system caused by the relief." 18 U.S.C. § 3626(a)(1)(A). The DOC stipulated "that if having longer hair or female undergarments or makeup were deemed to be medically necessary for an inmate with gender dysphoria, then the accommodation would be provided, with additional security measures taken if necessary." ECF 133 ¶ F.17. After finding that access to

Case No. 18-14096-HH, *Keohane v. Florida Department of Corrections Secretary*

female clothing and grooming standards are medically necessary for Ms. Keohane, the District Court acknowledged Defendant's stipulation and fashioned its injunction to meet it. ECF 171 at 60 ("Defendant abandoned [its security-concerns claim] on the eve of trial with its stipulation that if the requested treatments are medically necessary, they'll be provided with added security measures. Having so stipulated, Defendant is now put to that task."); *see also Plata*, 563 U.S. at 537-538 (rejecting the state's objection that the panel approved the state's own plan for reducing the prison population without considering whether the plan would affect public safety). The District Court appropriately deferred to the DOC's stipulation and met its obligations under the PLRA as a result.

## CONCLUSION

For the reasons above, the decision below should be affirmed.

**Respectfully submitted,**

**Daniel B. Tilley**
Florida Bar No. 102882
ACLU Foundation of Florida
4343 W. Flagler St., Suite 400
Miami, FL 33134
T. (786) 363-2714
F. (786) 363-1257
DTilley@aclufl.org

**Leslie Cooper**
ACLU Foundation
125 Broad Street, 18th Floor

**Elizabeth C. Akins**
DLA Piper LLP (US)
1201 W. Peachtree Street, NW
Suite 2800
Atlanta, GA 30309
T. (404) 736-7812
liza.akins@dlapiper.com

Case No. 18-14096-HH, *Keohane v. Florida Department of Corrections Secretary*

New York, NY 10004
T. (212) 549-2627
LCooper@aclu.org

**Counsel for Plaintiff-Appellee**

## CERTIFICATE OF COMPLIANCE

Pursuant to Federal Rule of Appellate Procedure 32(g)(1), Plaintiffs-Appellants state that this brief complies with the type-volume limitations set forth in Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 12,976 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(a)(f).

This brief also complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6) because it has been prepared in a proportionally spaced typeface in 14-point Times New Roman.

## CERTIFICATE OF SERVICE

Today, I electronically filed this document with the Clerk of Court using CM/ECF, which automatically serves opposing counsel Kirk Reid (kreid@joneswalker.com), Daniel Russell (drussell@joneswalker.com), and

Case No. 18-14096-HH, *Keohane v. Florida Department of Corrections Secretary*

William Hall (whall@joneswalker.com) via electronic transmission of Notices of

Docket Activity generated by CM/ECF.

/s/ Daniel B. Tilley
Daniel B. Tilley
Counsel for Appellee Keohane
